STATE OF MAINE                                   UNIFIED CRIMINAL DOCKET
CUMBERLAND, ss.                              DOCKET NO. CUMCD-CR-21-3200

STATE OF MAINE,                    )
                                   )
                                   )
                                   )
                                   )
            v.                     )
                                   )          **ORDER DENYING BAIL**
                                   )
ABDI AWAD,                         )
                                   )
            Defendant.             )
                                   )

On August 5, 2021, Defendant Abdi Awad was indicted for violation of 17-A

M.R.S. § 201(1)(A), Intentional or Knowing Murder. Defendant requests an order setting

bail. A *Harnish* bail hearing was held on February 28, 2022. The State presented thirty-

two exhibits, as well as an affidavit of Detective Daniel L. Townsend of the Portland

Police Department, dated November 1, 2021 ("Townsend Nov. Aff."). Defendant

presented eleven exhibits and the testimony of Detective Townsend. At the State's

request, evidence was reopened to allow the State to supplement the record with two

additional affidavits.[1] After careful review of all the evidence, the Court denies

Defendant's motion for bail for the following reasons.

**I.    Findings of Fact**

From the exhibits, testimony, and affidavits presented by the State and Defendant,

the Court finds that the following information is known to the police:

On August 1, 2011, at 4:25 a.m., Officer Deanna Hernandez responded to the Mobil

on the Run at 1196 Congress Street, Portland, Maine, for a report that a male had been

---

[1] Affidavit of Detective Kelly Gorham, dated November 11, 2018, filed in *State v. AT&T re 207-420-0302 and 207-420-0828,* CUMCD-SW-2018-249 ("Gorham Aff."), and Affidavit of Detective Daniel L. Townsend, dated June 4, 2021, filed in *In re 121 Massachusetts Ave,* CUMCD-SW-2021-119 (impounded) ("Townsend June Aff.").

shot. (Gorham Aff. ¶ 1.) Upon arrival, Officer Hernandez observed the victim lying on his back in the middle of Congress Street. (Gorham Aff. ¶ 1.) She saw what appeared to be a gunshot wound on his left side. (Gorham Aff. ¶ 1.) The victim was identified as Allen Patrick MacLean. (Gorham Aff. ¶ 1.)

Several witnesses were standing near Mr. MacLean's body. (Gorham Aff. ¶ 2.) One witness, Robert Lewis, was working at the Mobil on the Run at the time of the shooting. (Gorham Aff. ¶ 3.) He reported that he had stepped outside to smoke a cigarette when he heard a loud bang. (Gorham Aff. ¶ 3.) He witnessed a white male running across the street yelling, "I'm bleeding, I'm bleeding." (Gorham Aff. ¶ 3.) Other witnesses similarly reported hearing a loud crack or boom and seeing a man run from the area of 4 Massachusetts Avenue, yelling "I'm dying, I'm dying," or "Help me, help me." (Gorham Aff. ¶¶ 4, 5.)

Officers entered the apartment at 4 Massachusetts Avenue, where they found a person who identified himself as Khalid Said. (Gorham Aff. ¶ 6.) Mr. Said said that Mohamed Said (known as "Camel"), Benjamin Anthony (known as "Icy"), and two white females were also at the apartment at 4 Massachusetts Avenue that evening. (Gorham Aff. ¶ 10.) They were awakened by gunshots and people screaming. (Gorham Aff. ¶ 10.)

Officer Stickney and his K9 partner, Taz, responded to the scene for a track. (Gorham Aff. ¶ 7.) Near 28 Massachusetts Avenue, Taz alerted in the area of some bushes. (Gorham Aff. ¶ 7.) Officer Stickney located a small black handgun, which was identified as a Kel-Tec .380. (Gorham Aff. ¶ 7.) Evidence Technician Stearns swabbed the exposed side of the gun and collected it. (Gorham Aff. ¶ 30.) Evidence Technician Cote swabbed the left side of the handgun, as well as the round in the chamber and the two rounds in the magazine. (Gorham Aff. ¶ 31.) No impressions of comparable quality were developed on the handgun. (Gorham Aff. ¶ 32.)

ET Cote also collected from the scene: an orange Gatorade bottle, a black t-shirt, a bullet casing, an empty Bud Light can, and a Poland Spring bottle. (Gorham Aff. ¶ 28.) A small plastic bag containing what appeared to be marijuana was also collected. (Gorham Aff. ¶ 29.) Impressions were lifted from the Gatorade bottle, but they were of limited value for comparison. (Gorham Aff. ¶ 32.)

A .380 caliber bullet was removed from Mr. MacLean's body during an autopsy. (Townsend Nov. Aff. ¶ 1.) Robert Burns, a firearms examiner for the Maine State Police Crime Laboratory, concluded that the bullet located in Mr. MacLean's body and the casing found at the scene were fired from the handgun recovered from the bushes. (Townsend Nov. Aff. ¶ 11.)

A mixture of DNA profiles from at least two individuals was obtained from the handgun. (Gorham Aff. ¶ 38.) Defendant was not identified as a potential donor for the mixed DNA profiles from the swabs of the handgun, ammo, magazine, or small plastic bag.[2] The DNA profiles on these items were not consistent with the DNA profiles of Khalid Said or Mr. MacLean. (Gorham Aff. ¶¶ 38, 39.)

On August 3, 2011, Mr. Said returned to the police station to speak with Detective Lisa Sweatt. (Gorham Aff. ¶ 11.) Detective Sweatt showed Mr. Said a photo book. (Gorham Aff. ¶ 11.) Mr. Said identified Photo #4, which is a photo of Defendant, as "L." (Gorham Aff. ¶ 11.) Mr. Said said that L was in his apartment the night of the shooting. (Gorham Aff. ¶ 11.) Mr. Said described L as having long hair that he keeps in a ponytail or dreads, and, on the night of the shooting, he was wearing a black shirt, black shorts,

---

[2] At hearing, conflicting evidence was presented on this topic. Detective Townsend testified that Defendant was neither included nor excluded as a potential donor for the mixed DNA profiles, while the Gorham Affidavit indicates that Defendant was excluded as a potential donor. (*See* Gorham Aff. ¶ 44.)

and a fitted hat.[3] (Gorham Aff. ¶ 11.) He said that L was "on the phone a lot" and went outside several times. (Gorham Aff. ¶ 11.) Mr. Said saw L go outside shortly before he heard gunshots and did not see him again. (Gorham Aff. ¶ 11.) He told Detective Sweatt, "I guess I just gave you the shooter." (Gorham Aff. ¶ 11.) When asked why he hadn't provided this information earlier, Mr. Said said that police had not asked about L. (Gorham Aff. ¶ 11.) Mr. Said had never seen L with a gun. (Gorham Aff. ¶ 11.)

On August 5, 2011, police received a report of a cell phone found in a yard at 121 Massachusetts Avenue. (Gorham Aff. ¶ 23.) An examination of the phone revealed the number (207) 420-0302. (Gorham Aff. ¶ 23.) No impressions of comparable quality were developed on the phone, and the swab of the phone did not produce an interpretable DNA profile. (Gorham Aff. ¶¶ 36, 42.)

Detective Sweatt and Detective Paul Murphy contacted Eamon O'Connor, who had been with Mr. MacLean on the night of the shooting. (Gorham Aff. ¶ 12.) At some point in the evening, Mr. O'Connor drove Mr. MacLean to the area of Massachusetts Avenue and Bolton Street to buy drugs. (Gorham Aff. ¶ 14.) Mr. MacLean used Mr. O'Connor's phone to call "Ali" at either (207) 420-0302 or (207) 420-0203. (Gorham Aff. ¶ 14.) Mr. MacLean's friends reported that Mr. MacLean owed people money and appeared nervous about meeting Ali. (Townsend Nov. Aff. ¶ 3.) Mr. O'Connor did not know or see the drug dealer. (Gorham Aff. ¶ 14.)

At about 4 a.m., Mr. O'Connor drove Mr. MacLean to the Mobil on the Run to use the ATM. (Gorham Aff. ¶ 12.) Detective Townsend reviewed the ATM transaction logs, which revealed that Mr. MacLean was unable to withdraw money. (Townsend Nov. Aff. ¶ 7.)

---

[3] Other evidence, discussed below, shows Defendant wearing a green shirt and green hat.

When the store clerk came outside to smoke, Mr. O'Connor asked if he had seen Mr. MacLean, who had been in the store for a long time. (Gorham Aff. ¶ 12.) The store clerk said that Mr. MacLean had left through the door on the opposite side of the store. (Gorham Aff. ¶ 12.) Robert Lewis, the store clerk, confirmed that Mr. O'Connor asked him if he had seen Mr. MacLean. (Gorham Aff. ¶ 16.) Mr. O'Connor said he drove down Congress Street, then turned around and drove back towards the Mobil on the Run. (Gorham Aff. ¶ 12.) He heard a gunshot and saw Mr. MacLean lying on the sidewalk by the Mobil on the Run, without a shirt. (Gorham Aff. ¶ 12.) Security footage from the Mobil on the Run shows Mr. O'Connor's car arrive at the Mobil on the Run at 4:11:53, and leave at 4:17:43. (Gorham Aff. ¶¶ 15, 16.)

State's Exhibits 2 through 6 are still photographs from security video footage taken inside Mobile on the Run. Detective Townsend testified that the time stamps as they appear on the exhibits are about six minutes earlier than "true" time, as determined by officers upon reviewing the footage. State's Exhibit 2, with time stamp 4:12:37, shows Mr. MacLean entering the store. State's Exhibit 3, with time stamp 4:13:40, depicts Defendant holding what appears to be cash. State's Exhibit 4, with time stamp 4:14:05, depicts Defendant wearing a green shirt and green hat and holding a bottle of orange Gatorade. State's Exhibit 5, with time stamp 4:14:07, shows Defendant and Mr. MacLean interacting. Finally, State's Exhibit 6, with time stamp 4:14:08, shows Defendant and Mr. MacLean leaving the store together. The true time when Mr. MacLean followed Defendant out of the store was about 4:20:14 a.m. (Townsend Nov. Aff. ¶ 7.)

On January 2, 2014, Detective Sweatt met with Krista Morrison. (Gorham Aff. ¶ 17.) Ms. Morrison stated that she had been in the apartment at 4 Massachusetts Avenue on the night of the shooting with several others, including Defendant (whom she knew as "Mix") and Mr. Tsegai (whom she knew as "Icy"). (Gorham Aff. ¶ 17.) Ms. Morrison

said that she drove Defendant and Mr. Tsegai to meet with "Allen and his buddy" that evening. (Gorham Aff. ¶ 17.) Ms. Morrison did not know Allen. (Gorham Aff. ¶ 17.)

Ms. Morrison saw Defendant go in and out of the back door of the apartment frequently that night. (Gorham Aff. ¶ 17.) At one point, she heard Defendant tell Mr. Tsegai that "Allen was coming to make it right," and then saw Defendant leave the apartment. (Gorham Aff. ¶ 17.) She did not see Mr. Tsegai leave the apartment. (Gorham Aff. ¶ 17.)

From a bedroom facing the alley beside the apartment building, Ms. Morrison heard Defendant in the alley yelling about money. (Gorham Aff. ¶¶ 17, 18.) She did not hear anyone else. (Gorham Aff. ¶ 18.) She then heard three gunshots, followed by someone yelling, "I'm dying, help me, help me." (Gorham Aff. ¶ 18.) From the window in the kitchen, which faces Congress Street, Ms. Morrison saw a person running across Congress Street, towards the Mobil on the Run. (Gorham Aff. ¶ 18.) She did not recognize the person, but she knew that it was not Defendant. (Gorham Aff. ¶ 18.)

Ms. Morrison ran out to her car with other occupants of the apartment. (Gorham Aff. ¶ 19.) Mr. Tsegai called and asked them to pick him up on Massachusetts Avenue at Brighton Avenue. (Gorham Aff. ¶ 19.) They tried to call Defendant. (Gorham Aff. ¶ 19.) Mr. Tsegai said: "The guy had shorted him earlier in the night." (Gorham Aff. ¶ 19.)

A confidential informant for the Federal Bureau of Investigation provided information about a drug trafficking operation involving Mr. Tsegai and Hamadi Hassan.[4] (Gorham Aff. ¶ 24.) The informant reported that Mr. Hassan purchased a .380 handgun on June 29, 2011, from Derald Coffin, and that on July 1, 2011, Defendant bought a 9mm pistol with a thirty-round clip in a deal set up by David Stoddard. (Gorham Aff.

---

[4] The informant had previously provided federal agents with reliable information. (Gorham Aff. ¶ 24.)

¶ 25.) By July 25, 2011, Mr. Hassan was incarcerated. (Gorham Aff. ¶ 25.) On July 31, 2011, Mr. Coffin and Mr. Stoddard dropped off ammunition to Defendant and Mr. Tsegai near Massachusetts Avenue. (Gorham Aff. ¶ 25.).

On March 16, 2016, Detective Gorham and others met with Mustafa Hassan and his attorney. (Gorham Aff. ¶ 49.) Mustafa Hassan, who had signed an agreement with the United States Attorney's Office, identified two photos in a ten-photo lineup. (Gorham Aff. ¶¶ 51-52.) When asked if "Lali" and "Icy" were in any of the photos, he identified Photo #4 as Lali and Photo #10 as Icy. (Gorham Aff. ¶ 52.) Photo #4 was a photo of Defendant and Photo #10 was a photo of Mr. Tsegai. (Gorham Aff. ¶ 51.) Mustafa said that Lali's real name was Abdi Awad and that Icy's name was "Biniam something." (Gorham Aff. ¶ 52.)

Mustafa described an encounter with Mr. Tsegai and Defendant two days after the shooting. (Gorham Aff. ¶ 53.) Mustafa said that Defendant called him and picked him up at his apartment. (Gorham Aff. ¶ 53.) Defendant, who was with Mr. Tsegai, seemed upset and anxious. (Gorham Aff. ¶ 53.) Defendant asked Mustafa for money because he needed to go to Arizona. (Gorham Aff. ¶ 53.) When Mustafa asked why, Defendant said that he shot "the white guy" because he tried to "rip him off." (Gorham Aff. ¶ 53.) Mustafa said that Defendant had thrown out the gun and his phone. (Gorham Aff. ¶ 55.) When asked what type of gun Defendant had, Mustafa said: "It was subcompact like, a .380 or something." (Gorham Aff. ¶ 55.)

Detective Townsend's November 1, 2021 affidavit includes a summary of Defendant's criminal history. Of note to the Court is the fact that Defendant was arrested by the United States Border Patrol stationed at the Sierra Blanca Checkpoint near the Texas-Mexico border on August 22, 2011 (three weeks after the shooting of Mr. MacLean), on a Maine warrant for Elevated Aggravated Assault. (Townsend Nov. Aff. ¶ 16.)

Defendant was ultimately convicted of Elevated Aggravated Assault in 2012. (Townsend Nov. Aff. ¶ 20.) The crime involved Defendant stabbing the victim in the back with a folding knife. (Townsend Nov. Aff. ¶ 20.) Defendant received a sentence of twenty-five years, all but eighteen years suspended, and four years of probation. (Townsend Nov. Aff. ¶ 20.) Defendant completed serving the unsuspended portion of the sentence on August 18, 2021. (Townsend Nov. Aff. ¶ 20.) Elliot Arsenault, an Enforcement and Removal Operations Agent with Immigration & Customs Enforcement ("ICE"), represented to Maine law enforcement officers that ICE may seek to initiate immigration proceedings against Defendant in connection with the 2012 conviction upon his release. (Townsend Nov. Aff. ¶ 22.)

Defendant presented to the Court a resume of his community work and many accomplishments while a resident of the Maine State Prison. Defendant has earned a bachelor's degree and is working towards a master's degree in adult and higher education. He is a certified yoga instructor. He serves various roles in several programs, committees, and community groups within the Maine State Prison. Defendant also presented numerous letters of support and character reference from professors and adjuncts within the University of Maine Augusta and University of Southern Maine systems; family members; employees of the Maine State Prison; Matt Magnusson, Warden of the Maine State Prison; and others.[5] It is evident to the Court that Defendant has dedicated significant time and effort to education, self-improvement, and betterment of the community over the course of many years.

II.     **Conclusions of Law**

---

[5] Letters initially received appeared to be prepared in anticipation of an immigration proceeding. At the Court's request prior to the February 28, 2022 hearing, Defendant did obtain and provide to the Court letters confirming that the writers' support for Defendant was unchanged in light of a new murder charge.

The *Harnish* hearing addresses bail in the context of probable cause to believe a crime has been committed. *State v. Eaton*, 669 A.2d 146, 148-49 (Me. 1995). "Evidence presented at a *Harnish* bail proceeding may include testimony, affidavits and other reliable hearsay evidence as permitted by the court." 15 M.R.S. § 1027(2) (2021). The Court must first determine whether probable cause exists "to believe that the defendant has committed a formerly capital offense." *Id.* Knowing or Intentional Murder is a "formerly capital offense." *Harnish v. State*, 531 A.2d 1264, 1265 n.1 (Me. 1987). If the Court does not find probable cause, the Court must issue an order setting bail pursuant to 15 M.R.S. § 1026. If the Court finds probable cause exists, then:

> The court's finding that probable cause exists to believe that the defendant committed a formerly capital offense extinguishes the defendant's right to have bail set. The court shall make a determination as to whether or not the setting of bail is appropriate as a matter of discretion. The court may set bail unless the State establishes by clear and convincing evidence that:

> > A. There is a substantial risk that the capital defendant will not appear at the time and place required or will otherwise pose a substantial risk to the integrity of the judicial process;

> > B. There is a substantial risk that the capital defendant will pose a danger to another or to the community; or

> > C. There is a substantial risk that the capital defendant will commit new criminal conduct.

> In exercising its discretion, the court shall consider the factors listed in section 1026.

15 M.R.S. § 1027(3).

### A. Probable Cause

"'Probable cause exists where facts and circumstances within the knowledge of the officers and of which they have reasonably trustworthy information would warrant a prudent and cautious person to believe that the [defendant] did commit or is committing

the felonious offense.'" *State v. Journet*, 2018 ME 114, ¶ 15, 191 A.3d 1181 (quoting *State v. Lagasse*, 2016 ME 158, ¶ 13, 149 A.2d 1153).

The State's exhibits and affidavits demonstrate that police had reasonably trustworthy information of the following:

1. In the month preceding the shooting, Defendant purchased guns and ammunition, and Mr. Hassan purchased a .380 handgun;

2. Mr. MacLean had called the number of the found phone to purchase drugs on the night of his murder;

3. Defendant met Mr. MacLean at the Mobil on the Run on the night of the shooting, where Defendant purchased an orange Gatorade;

4. Defendant and Mr. MacLean left the Mobil on the Run together mere minutes before the shooting;

5. A witness located near the alley beside 4 Massachusetts Avenue heard Defendant in the alley yelling about money, followed by gunshots;

6. Defendant told others that Mr. MacLean had underpaid him;

7. Multiple witnesses saw Mr. MacLean run from the area of 4 Massachusetts Avenue towards Congress Street, while yelling for help;

8. An orange Gatorade bottle was found at the scene, and a .380 handgun and cellphone were recovered nearby; and

9. Defendant told an individual that he shot "the white guy" and then threw away his phone and his gun.

Probable cause to believe Defendant committed the crime of Knowing or Intentional Murder clearly exists. Because probable cause exists, Defendant's right to have bail set is extinguished.

**B. Substantial Risk**

Because the Court has found that probable cause exists, the Court must now determine whether the State has established by clear and convincing evidence the existence of a substantial risk that Defendant will not appear, that Defendant will pose a

danger to another or the community, or that Defendant will commit new criminal conduct if released on bail. *See* 15 M.R.S. § 1027(3).

The defendant is accused of an offense which carries with it a mandatory minimum sentence of twenty-five years. The incentive to flee prosecution is great. The Court is aware that Defendant may be subject to immigration proceedings upon his release, increasing the incentive to flee. Moreover, federal jurisdiction may preclude a later return to state custody to answer to the murder charge. Finally, it is of note to the Court that Defendant was apprehended on prior charges by Border Patrol officers at a checkpoint near the border between Texas and Mexico.

Based on the foregoing, the Court finds that the State has established by clear and convincing evidence that there is a substantial risk that Defendant, if released on bail, will fail to appear. The Court is, therefore, precluded from setting bail.

Even if the State had failed to establish a substantial risk, the Court would not, in its discretion, admit Defendant to bail. Despite Defendant's evidence of tremendous self-improvement and the commendations of many who know him, the seriousness of the crime charged and the Defendant's criminal history weigh strongly against setting bail.

## III.  Conclusion

For the foregoing reasons, the Court cannot admit Defendant to bail.

The entry is:

Defendant's motion to set bail is DENIED.

The clerk is instructed to incorporate this Order by reference on the docket.

Dated: _April 4, 2022_

MaryGay Kennedy, Justice
Maine Superior Court

Page 11 of 11